419 P.2d 59

**STATE of Arizona, Appellee,**

**v.**

**Barney INTOGNA, Appellant.**

**No. 1608.**

Supreme Court of Arizona.

In Banc.

Oct. 13, 1966.

Darrell F. Smith, Atty. Gen., William J. Schafer, III, Pima County Atty., William T. Healy, Tucson, for appellee.

William A. Scanland, Joseph D. Howe, Tucson, for appellant.

McFARLAND, Justice:

Barney Intogna, hereinafter referred to as defendant, was charged, tried, and found guilty by a jury of the crime of murder in the second degree, in violation of A.R.S. § 13–451 and § 13–452. He was sentenced to serve a term of not less than ten, nor more than eleven years, in the Arizona State Prison. From the verdict and judgment of conviction, defendant brings this appeal.

On May 30, 1964, defendant was alone in the back yard of his home at 765 West Valencia, Tucson, Arizona. He had just returned from a picnic outing with Vivian Bolen and her children. The deceased, Don Bolen, Vivian Bolen's ex-husband, who had been divorced from her for about a year, drove up and stopped his car on the street outside the yard. A neighbor, Dan Don, testified that he later saw Bolen on the sidewalk next to defendant's yard "on the verge of stepping off, heading towards his car." Defendant came toward Bolen and spoke to him. Bolen then turned around and went over to a low fence surrounding the yard where shortly thereafter defendant fired two shots into his body from a semi-automatic pistol. He staggered and fell to the sidewalk, where he died.

Tucson police officer, Keith Wright, heard the shots and went immediately to the scene. Officer Wright administered first aid to the victim, and on being told by a bystander that a man had run into the house, jumped over the fence and went into the house where defendant was found and taken into custody.

At the trial, in support of his plea of self-defense, defendant presented substantial testimony to the effect that Bolen was extraordinarily jealous of defendant's attentions toward his ex-wife and had, on several occasions, threatened to kill him. There was also evidence that Bolen was intoxicated on the evening in question and was known to have a reputation for meanness and belligerence when intoxicated.

Defendant's first contention is that the information was insufficient to charge defendant with first degree murder and to support his being bound over and tried on that charge, in that it lacked an allegation of premeditation. The information charged defendant with having committed the crime of murder, no degree specified. An information which charges murder without specifying the degree is sufficient to charge murder in the first degree. State v. Woolery, 93 Ariz. 76, 378 P.2d 751; State v. Peats, 97 Ariz. 133, 397 P.2d 631; Macias v. State, 39 Ariz. 303, 6 P.2d 423; Rule 142, Rules of Criminal Procedure, 17 A.R. S.; Rule 115, Rules of Criminal Procedure, 17 A.R.S.; A.R.S. § 13–451 and § 13–452.

Defendant's next question goes to the sufficiency of the evidence to support the conviction of second degree murder and instructions on first degree murder, second degree murder, voluntary manslaughter, and involuntary manslaughter. Deliberation and premeditation may be shown from circumstances. State v. Singleton, 66 Ariz. 49, 182 P.2d 920; State v. Izzo, 94 Ariz. 226, 383 P.2d 116. Malice aforethought may be express or implied. A.R.S. § 13–451. It is a question of fact to be determined by the jury. A deadly weapon, a pistol, was used in the killing, and the use of a deadly weapon is sufficient evidence for the jury to find express malice. State v. Izzo, supra; State v. Rivera, 94 Ariz. 45, 381 P.2d 584. Defendant either had a pistol on his person, or secured it on

Bolen's arrival. There was sufficient opportunity to premeditate and deliberate. There is evidence that defendant spoke to deceased while deceased was stepping away in the direction of his car whereupon he turned and faced defendant shortly prior to the shooting. Deceased was unarmed and was killed while standing on a public sidewalk outside defendant's fence.

Under this state of facts the court was justified in giving instructions on both first and second degree murder, and submitting this question to the jury. On this ground, the verdict will not be disturbed by this court on appeal. State v. Wallace, 98 Ariz. 243, 403 P.2d 550.

Defendant testified that deceased struck him and that he then began shooting. Were the jury to take this testimony into consideration with the facts above stated, the instructions as to manslaughter and supporting instructions relating to inducement of a quarrel and defendant's right of self-defense after cessation of the real or apparent danger were justified by the evidence. The charge of involuntary manslaughter was based on the theory that the killing occurred while in the commission of an unlawful act, that is, the discharge of a firearm within the limits of any municipality in violation of A.R.S. § 13–917.01. A jury may be instructed on as many theories as are logically deducible from the testimony. State v. Mathis, 92 Ariz. 194, 375 P.2d 388.

In the instant case defendant testified he did not remember aiming the pistol, nor did he remember how far away he was when he shot deceased, but defendant did testify he had the pistol in his hand while talking to him. This evidence justified an instruction on involuntary manslaughter. Harding v. State, 26 Ariz. 334, 225 P. 482. In any event, the giving of this instruction was not prejudicial to defendant since he was convicted of second degree murder. Macias v. State, 36 Ariz. 140, 283 P. 711.

Defendant further cites as error the returning of the verdict of guilty of second degree murder, with the added words "with clemency". In Arizona the jury is without statutory authority to consider the sentence or punishment in a verdict of second degree murder. In Krull v. United States, 5 Cir., 240 F.2d 122, the court said:

"* * * If the jury, without statutory authority, makes a recommendation for clemency, it does not invalidate the verdict and may be disregarded by the court in imposing sentence. * * *" 240 F.2d at 133

The trial court did not commit error in rendering judgment on this verdict, as such an unauthorized recommendation may be treated as mere surplusage and of no legal effect. Thlinket Packing Co. v. United States, 9 Cir., 236 F. 109; United States v. Mankowski, E.D.Wis., 179 F.Supp. 667; State v. Green, 220 S.C. 315, 67 S.E.2d 509, Riddle v. State, Okl.Cr., 374 P.2d 634; 17 A.L.R. 1117; 87 A.L.R. 1362; 138 A.L.R. 1230.

Defendant contends the court erred in not permitting a psychiatrist, Dr. Lindsay Beaton, to show by exert testimony that defendant lacked the necessary intent to deliberate or act with malice aforethought. In an offer of proof made outside the jury's presence, Dr. Beaton testified defendant was of a type classified as a passive dependent, and in answer to a hypothetical question, stated that a man of this personality type would have acted from fear in shooting deceased under the circumstances outlined in the question. The hypothetical question generally portrayed the evidence most favorable to defendant's claim of self-defense.

In State v. Schantz, 98 Ariz. 200, 403 P.2d 521, this court reaffirmed its adherence to what is known as the Rule of M'Naghten's Case as the test of criminal insanity and refused to allow a defense based on a mental derangement lesser than, or distinguishable from, the M'Naghten Rule, which Arizona has consistently followed. State v. Preis, 89 Ariz. 336, 362 P.2d 660, cert. denied, 368 U.S. 934, 82 S.Ct. 372, 7

L.Ed.2d 196; State v. Crose, 88 Ariz. 389, 357 P.2d 136; State v. Coey, 82 Ariz. 133, 309 P.2d 260; State v. Macias, 60 Ariz. 93, 131 P.2d 810.

In State v. Schantz, supra, we restated the insanity test, under which expert evidence is admissible, as follows:

"This test of legal insanity has two elements. An accused must have had at the time of the commission of the criminal act:

"(1) Such a defect of reason as not to know the nature and quality of the act, or

"(2) If he did know, that he did not know he was doing what was wrong." 98 Ariz. at 207, 403 P.2d at 525

This court has consistently held expert testimony which does not meet this test to be inadmissible for other purposes. In State v. Narten, 99 Ariz. 116, 407 P.2d 81, defendant offered psychiatric testimony showing the absence of a specific mental state, though not amounting to legal insanity. This court again voiced its rejection of the defense of "partial irresponsibility" and found the testimony inadmissible to reduce the degree of the offense charged. In the instant case the court properly refused the admission of the expert testimony in regard to self-defense.

■■■■ Defendant contends that the court erred in admitting the gun in evidence for two reasons—(1) that it was obtained through an "illegal search and seizure"— and (2) it was the product of an illegally obtained admission. Under the statutory authorization expressed in A.R.S. § 13–1403, an officer may arrest without a warrant "[w]hen he has reasonable ground to believe that a felony has been or is being committed and reasonable ground to believe that the person to be arrested has committed or is committing it." A.R.S. § 13–1403(4). To determine the legality of the search and seizure, we will consider the evidence adduced at the trial, as well as the evidence presented upon the motion to suppress. State v. Randall, 94 Ariz. 417, 385 P.2d

709; Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543.

■■■■ Officer Wright testified he heard the shots and when he arrived, saw the fatally wounded victim on the sidewalk and was told that the assailant was in the house. Defendant testified he opened the door and told Officer Wright "I am the man you are looking for." These facts justify an arrest without a warrant under the statute. It is well settled that a search without a warrant is justifiable when it is incident to a lawful arrest; a seizure, on such a search, of evidence related to the crime is likewise permitted. State v. Pelosi, 68 Ariz. 51, 199 P.2d 125; United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653. While defendant had told Officer Wright the gun was in the house, the court held it was found in the course of the legal search rather than as the result of what defendant told Officer Wright. It is true defendant was taken out of the house and turned over to another officer; however the search in which the gun was found was continued without interruption. The measurements and the search for the evidence made by the officer in connection with the arrest at the scene of the crime, just after the officer had found the body on the ground, were the acts of diligent officers in furtherance of their duty to ascertain the facts of the homicide. As there was ample evidence to support the findings of the trial court, we hold the lower court did not err in admitting the gun in evidence.

The trial court admitted in evidence a statement made by defendant to the police officer at the scene of the shooting. Defendant claims this to be error under the doctrine expressed in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed. 2d 977.

At the trial, in a hearing outside the presence of the jury, the following facts were brought out: Officer Wright was only a block away and arrived on the scene shortly after the shooting. He administered first aid and radioed for an ambulance. He

also testified in detail in regard to events leading up to and including the statement:

"Q Did you go to that particular area or that residence there that we have just been describing, that State's Exhibit 4 in evidence?

"A Yes.

"Q And why did you go there?

"A I had reason to believe that the defendant was in the house.

"Q Okay. When you got to the house, will you point out to the Court where you entered the house on this exhibit.

"A In this door here.

"Q All right. Tell us just what you did when you got to the back door.

"A When I got to the back door of the house itself I opened the door and the Defendant was immediately inside the door. I asked him—

\*    \*    \*    \*    \*    \*

"A I asked him why he shot, 'Why did you shoot him?' and he stated, 'Because he was threatening me.' And then—

"Q What did you do then?

"A Then I grabbed him and brought him outside, I handcuffed him approximately right here and took him to my police vehicle.

"Q Were you in uniform at that time?

"A. Yes, I was.

"Q Did you have a gun on you?

"A Yes.

"Q Did you have it out or was it holstered or what?

"A When I first met him I had it out; however, when I took him back to the tree I needed both hands so I holstered my weapon.

"Q How many guns did you have on you?

"A I had two.

\*    \*    \*    \*    \*    \*

"Q And you say Mr. Intogna was right at the back door?

"A Approximately three feet from it."

Defendant himself testified at the trial as follows:

"\* \* \* I was calling up the police and when I seen the policeman go by my living room window, going by my living room window, going towards the carport, so I went out to the kitchen and opened the kitchen door and I said 'I am the man you are looking for.'"

■ The recent case of Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882, held that Escobedo v. State of Illinois, supra, and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, were not to be applied retroactively, and as the trial in the instant case was after Escobedo and before Miranda, only the holding in Escobedo is controlling. In Escobedo v. State of Illinois, supra, the United States Supreme Court stated:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S., 335, at 342, 83 S.Ct. 792, at 795, 9 L.Ed.2d 799, and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." 378 U.S. at 490, 84 S.Ct. at 1765.

■ Statements or admissions, be they exculpatory or inculpatory, which have been elicited by the police in violation of a defendant's constitutional rights, are subject

to the same exclusionary rules as a confession. State v. Owen, 96 Ariz. 274, 394 P.2d 206. Explaining what was meant by an investigation having "begun to focus on a particular subject", the United States Supreme Court in Miranda v. State of Arizona, supra, stated:

" * * * By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way. * * *⁴

* * * * * *

"4. This is what we meant in *Escobedo* when we spoke of an investigation which had focused on the accused." [Footnote by the court] 384 U.S. 436 at 444, 86 S.Ct. 1602 at 1612

In the case at bar, the trial judge determined after the hearing that the investigation had not yet reached the accusatory stage. While in Johnson v. State of New Jersey, supra, the court held that Miranda v. State of Arizona, supra, was not retroactive, this quotation from Miranda is explanatory of the meaning of Escobedo; therefore in determining whether evidence is admissible under Escobedo, we must follow the interpretation in Miranda of the meaning of what the court said in Escobedo.

It is not contended in the instant case that defendant was advised of his rights. The basis of the court's ruling was that the investigation had not reached the accusatory stage. The case at bar was tried before Miranda and the lower court did not have the benefit of this amplification of the meaning of Escobedo. In determining whether the case had passed to the accusatory stage, we must apply the rule in Escobedo, as construed and explained in Miranda. While defendant was not actually arrested when the question was asked as to why he shot deceased, it will be noted from the testimony that Officer Wright had his gun drawn and was within three feet of defendant when he asked the question.

In Miranda the court said that what was meant by custodial interrogation was questioning initiated by law enforcement officers after a person has been taken into custody. However, the court added: " * * * *or otherwise deprived of his freedom in any significant way * * *"* [Emphasis supplied] Certainly a defendant questioned by an officer with a drawn gun within three feet of him was deprived of his freedom in a significant way. Clearly, the officer had no intention of letting defendant escape and defendant himself could not have reached any other conclusion.

The officer had stated he went into the house because he believed defendant was there. According to defendant's testimony, he told the officer: " * * * I am the man you are looking for." Then Officer Wright, with his gun drawn, asked the question why he shot Bolen. We are unable to say from these facts that the statement made by defendant was voluntary. It will be noted that while Officer Wright stated he "grabbed" him after the question was answered, the "grabbing" of him could hardly be construed as depriving him of his freedom any more than standing within three feet of him with a drawn gun while questioning him.

We therefore hold that the statement was not admissible.

This case is reversed and remanded to the court for further proceedings not inconsistent with this opinion.

STRUCKMEYER, C. J., BERNSTEIN, V. C. J., and UDALL and LOCKWOOD, JJ., concur.